PD-0052-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 2/6/2015 3:10:29 PM
Accepted 2/6/2015 4:11:57 PM
ABEL ACOSTA
CLERK

NO. <u>0052-15</u>

IN THE COURT OF CRIMINAL APPEALS

_____

**JULIA RHOTON ANDREWS,** Petitioner

**v.**

**THE STATE OF TEXAS,** Respondent

_____

# PETITION FOR DISCRETIONARY REVIEW
_____

FROM THE COURT OF APPEALS, NINTH JUDICIAL DISTRICT
NO. 09-13-00407-CR
FROM THE DISTRICT COURT OF ORANGE COUNTY
260TH JUDICIAL DISTRICT ; Cause No. D-130,174-R
THE HONORABLE BUDDIE J. HAHN PRESIDING

FILED IN
COURT OF CRIMINAL APPEALS

February 6, 2015

ABEL ACOSTA, CLERK

CHRISTINE R. BROWN-ZETO
Texas Bar No. 03102200
Attorney at Law
1107 Green Avenue
Orange, TX  77630
(409) 886-8558 - Phone
(409) 883-6523 - Fax
crbrown@exp.net
AttorneyforPetitioner

*ORAL ARGUMENT REQUESTED*

## IDENTITY OF PARTIES AND COUNSEL

**Petitioner**:          JULIA RHOTON ANDREWS

Trial Counsel:       Greg Dumas
1601 Main St.
Orange, TX  77630
State Bar No.06201080

Appellate Counsel:   Denise I. Gremillion
202 S. Border St.
Orange, TX  77630
State Bar No. 24041974

Christine R. Brown-Zeto
1107 Green Avenue
Orange, TX 77630
State Bar No. 03102200

**Respondent**:       State of Texas

Counsel:          Cory Kneeland
(Trial and Appeal)  Orange County Assistant District Attorney
801 W Division Ave.
Orange, TX 77630
State Bar No. 24041264

# TABLE OF CONTENTS

Identity of Parties and Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Contents      ii

Index of Authorities      iii

Statement of the Nature and Result of the Case      1

Request for Oral Argument      2

Statement and Procedural History in the Case      2

Grounds for Review      3

     Error 1:     The evidence was legally and factually insufficient for the jury to rationally find beyond a reasonable doubt that Petitioner acted with the intent to cause Peddy's death or serious bodily injury to him   . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of Facts      3

Summary of the Argument      7

Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Certificate of Compliance      13

Certificate of Service      13

Appendix      14

# Index of Authorities

**Cases**

*Bowen v. State*, 374 S.W.3d 427 (Tex. Crim. App. 2012)      12

*Brooks v. State*,323 S.W.3d 893 (Tex. Crim. App. 2010)      8

*Clayton v. State*, 235 S.W.3d 772 (Tex. Crim. App. 2007)      8

*Conner v. State*, 67 S.W.3d 192 (Tex. Crim. App. 2001)      10

*Foster v. State*, 639 S.W.2d 691 (Tex. Crim. App. 1982)      10

*Gonzalez v. State,* 337 S.W.3d at 479 (Tex. Crim. App. ) . . . . . . . . . . . . .      11

*Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)      8,9,10

*Turner v. State,* 805 S.W.2d 423 (Tex. Crim. App. 1991)      10

**Statutes**

TEX. PEN.CODE ANN. § 19.02(b)      9

TEX. PEN.CODE ANN. § 19.04      9

TEX. PEN.CODE ANN. § 6.03(c)      9

**STATEMENT OF THE NATURE AND RESULTS OF THE CASE**

On March 13, 2013, Petitioner was charged by indictment with the first degree felony offense of Murder. (C.R. 5). The Indictment originally charged that Petitioner, on or about November 28, 2012, did then and there intentionally and knowingly cause the death of an individual, Randy Peddy, by shooting the said Randy Peddy with a firearm.(C.R. 5). On July 29, 2013, the Indictment was amended by the State without objection to add a second paragraph alleging that Petitioner, with intent to cause serious bodily injury to Randy Peddy, did then and there commit an act clearly dangerous to human life that caused the death of said Randy Peddy, by shooting Randy Peddy with a firearm. (C.R. 36, 56).

Voir dire was conducted on August 05, 2013, and a jury was sworn. (3 R.R. 7-74). Petitioner entered a plea of not guilty to the allegations in the indictment, and the case was tried to the jury. (4 R.R. 6).

After three days of trial, the charge of the court was presented to the jury; the charge permitted the jury to consider both the murder charge and the lesser-included offense of manslaughter. After deliberating, the jury found Petitioner guilty of Murder. (8 R.R. 21-22). The jury assessed punishment at forty-four years confinement in State Jail and a $4,400.00 fine. (8 R.R. 22). On August 8, 2013, the

1

trial court entered a Judgment of Conviction by Jury in conformity with the jury's verdict. (C.R. 59).

Petitioner requests oral argument in the event that this Court of Appeals feels that oral argument would further aid them in their determination.

The Court of Appeals for the Ninth Judicial District affirmed the decision of the trial court on December 10, 2014. No Motion for Rehearing was filed. It is from this decision that the Petitioner appeals.

## REQUEST FOR ORAL ARGUMENT

Petitioner requests oral argument in the event that this Court of Appeals feels that oral argument would further aid them in their determination.

## STATEMENT OF THE PROCEDURAL HISTORY OF THE CASE

The Court of Appeals for the Ninth Judicial District affirmed the decision of the trial court on December 10, 2014. No Motion for Rehearing was filed. It is from this decision that the Petitioner appeals.

2

## GROUND FOR REVIEW

**ERROR 1:** The evidence was legally and factually insufficient for the jury to rationally find beyond a reasonable doubt that Petitioner acted with the intent to cause Peddy's death or cause serious bodily injury to him.

### Statement of Facts

Prior to this event, Petitioner had known the victim, Randy Peddy("Peddy") for 10 to 15 years. (4 R.R. 57)  In or around approximately June, 2012, Petitioner and Peddy were involved in a short relationship and were affectionate with each other. (5 R.R. 87).  In July, 2013 Peddy began dating Petitioner's daughter, Jackie Uzzell (Uzzell), and they continued that relationship until Peddy's death. (5 R.R. 86). Peddy stayed at Petitioner's home periodically.  (4 R.R. 57).

In the early afternoon of Wednesday, November 28, 2012, Peddy was at Petitioner's home, where he was supposed to have been working on Petitioner's car. (4 R.R. 57).  Petitioner noticed that Peddy had been drinking, and she saw him with a Vodka bottle.  (4 R.R. 58-59).  In her police statement, Petitioner noted that Peddy was a frequent beer drinker, but that Vodka made him "mean, hateful, ugly, and a totally different person."  (4 C.R. 58-59).

At Peddy's request, Petitioner brought him back to his father's house, where she instructed him that he could come over the following day if he quit drinking.  (4

3

R.R. 59-60). Petitioner and Peddy engaged in a minor verbal altercation, then Petitioner left Peddy's father's house. (4 R.R. 60).

At approximately5:00 to 5:30 that afternoon, Peddy returned to Petitioner's home, purportedly looking for his battery. (4 R.R. 60). At that time, Petitioner was on the phone with Uzzell, who requested that Petitioner get her phone back from Peddy. (4 R.R. 60). Peddy refused to return the phone, and left the residence again. (4 R.R 60).

At approximately 8:30 that evening, Peddy again returned to Petitioner's home. (4 R.R. 60-61). Petitioner was at the home with her granddaughter, Jessica Andrews ("Jessica"), and her grandson's girlfriend, Kailyn Hunt ("Hunt"). (4 R.R. 56). On Peddy's arrival, Petitioner called Uzzell to let her know Peddy was back; Uzzell did not want Peddy there while he was drinking because he got "physically assaultive" with her when he drank Vodka. (4 R.R. 60-61). Uzzell called the police; Officer Greg Harbison ("Harbison") arrived at the house at approximately 8:40 p.m. and questioned Petitioner about her wellbeing as requested by Uzzell. (4 R.R. 62). Petitioner told Harbison that Peddy was intoxicated, but that he was going to go to sleep and would not cause any more problems, so she was fine. (4 R.R. 16, 62). With that, the officers left. (4 R.R. 62). Peddy then became very agitated over the police having been called, and he demanded to know who had called them. (4 R.R. 62-63).

4

Shortly after that, Peddy went outside and was overheard by Petitioner and Hunt, who were inside the home, cursing and having a very heated telephone conversation with a person who they believed to have been Uzzell. (4 R.R.63-64). After hearing glass breaking and a banging noise, Petitioner went outside to find Peddy throwing cement blocks through the windows of her car. (4 R.R. 64). Petitioner approached Peddy to stop him from further damaging her car, and a verbal and physical confrontation ensued, with Peddy threatening physical violence against Petitioner. (4 R.R. 64-65). Petitioner, now fearing that Peddy would hit her with one of the cement bricks, returned to the house with Peddy throwing things at her as she did. (4 R.R. 65). When she got back into the house, Petitioner locked the door behind her, then retrieved a .22 rifle from behind her bedroom door to scare Peddy off. (4 R.R. 65). Petitioner walked out the front door and turned toward Peddy, who was standing on the other side of the driveway, and she fired one shot toward the direction of the street. (4 R.R. 66). Rather than leave, Peddy responded by cursing at Petitioner and continuing to move toward her. (4 R.R. 66). Petitioner then pointed the gun more toward Peddy and fired what she believed was three more shots, after which Peddy slumped over, grabbing at his stomach. (4 R.R. 66). Petitioner, in shock, went back inside the house, put the gun back in her room, and told Jessica and Hunt that she had shot Peddy. (4 R.R. 66). Petitioner appeared visibly distraught,

physically upset and was witnessed shaking and crying. (5 R.R. 114). Petitioner's grandson arrived shortly after the shooting and Petitioner also told him "I shot Randy. I didn't mean to." (4 R.R. 66).

At approximately 9:40 that evening, Officer Greg Harbison("Harbison") received the call for a disturbance at Petitioner's home. (4 R.R. 17). He returned to the home with his partner, Deputy Helton, and Sergeant Brading from the Vidor Police Department. (4 R.R. 19). Upon arriving at the home for the second time that day, Harbison observed Peddy's body lying just west of the residence, off to the side of the driveway. (4 R.R. 17). Harbison checked on Peddy, and determined that he was deceased. (4 R.R. 19-20). Harbison observed damage to Petitioner's vehicle, including the windshield being shattered and cinder blocks in the front and back windshield. (4 R.R. 31).

Harbison went into the residence and spoke with Petitioner. (4 R.R. 20). Harbison witnessed that Petitioner was crying and very upset, and continually saying she was sorry. (4 R.R. 35-36). Petitioner reported the sequence of events to Harbison, including that Peddy had assaulted her. (4 R.R. 32). Harbison noted redness and an abrasion to the right side of Petitioner's face. (4 R.R. 22-23). Harbison testified at trial that the injuries looked like they had probably just occurred as a result of the reported assault. (4 R.R. 34). Petitioner admitted that she had shot

6

Peddy, stating that she was trying to fire warning shots and that he continued walking toward her, so she fired again. (4 R.R. 25). Petitioner was then transported to the Orange County Sheriff's Office to be interviewed. (4 R.R. 44).

## SUMMARY OF THE ARGUMENT

Petitioner's conviction should be reversed and a judgment of acquittal entered because the evidence was legally and factually insufficient to prove that Petitioner acted with intent to kill or cause serious bodily injury to Peddy at the time that she fired warning shots in his direction. Alternatively, her conviction should be reversed and the verdict reformed to the lesser-included offense of manslaughter if the Court finds that sufficient evidence exists that Petitioner caused Peddy's death while acting with reckless disregard for the consequences of her actions.

## ARGUMENT

The Court of Appeals determined that the evidence was legally and factually sufficient for the jury to rationally find beyond a reasonable doubt that the Petitioner acted with the intent to cause Peddy's death or serious bodily injury to him. In making this determination there was such a departure from the accepted and usual course of judicial proceedings as to warrant an exercise of the Court of Criminal Appeals' power of supervision.

7

### A. Standard of Review

The Court of Criminal Appeals has held that "a rigorous and proper application" of the *Jackson* legal sufficiency standard is "the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt".*Brooks v. State*,323 S.W.3d 893, 902-03, 906, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). The reviewing court considers both direct and circumstantial evidence and all reasonable inferences that may be drawn therefrom in making its determination. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). An appellate court then determines whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Id*.

To determine the sufficiency of the evidence under the *Jackson* standard, an appellate court must review all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt .*Jackson*, 443 U.S. at 319. Evidence is legally insufficient under this standard if the record contains no evidence, or merely

8

a "modicum" of evidence, probative of an essential element of the offense, or if the evidence conclusively establishes a reasonable doubt. *Id.* at 320.

## B.    *Legal Analysis*

In order to support a conviction for murder in this case, a felony of the first degree, the State bore the burden to prove beyond a reasonable doubt that Petitioner: (1) intentionally or knowingly caused Peddy's death, or (2) intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused Peddy's death. TEX. PEN. CODE § 19.02(b); (4 R.R. 5)§§.

To support a conviction for manslaughter, on the other hand, the evidence must prove that Petitioner recklessly caused Peddy's death. TEX. PEN. CODE § 19.04§§. A person acts recklessly "when he is aware of but consciously disregards a substantial and unjustifiable risk." TEX. PEN. CODE § 6.03(c)§§.  "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.*§§

Thus, the primary issue in this case is whether Petitioner acted with the specific intent to kill or harm Peddy, or whether Peddy's death was the accidental result of Petitioner firing her weapon in his direction in an attempt to scare him away because Petitioner was in fear for her safety.

In determining whether the evidence is legally sufficient to support a conviction for murder, the court must consider all the evidence to determine whether a rational fact finder could have found intent to kill or cause serious bodily injury beyond a reasonable doubt. *Jackson*, 443 U.S. at 318-19. Even the mere intent to pull the trigger of a firearm does not satisfy the requirement that a defendant had the specific intent to kill the victim. *See Turner v. State,* 805 S.W.2d 423, 430 (Tex.Crim.App.1991).

Intent is generally proven through the circumstantial evidence surrounding the crime, and the jury may infer the requisite intent from a defendant's conduct, including both her conduct and her words. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). Further, while specific intent to kill or cause serious bodily injury may be presumed from a defendant's use of a deadly weapon, that presumption is rebuttable. *Foster v. State*, 639 S.W.2d 691, 695 (Tex. Crim. App. 1982). Where there is evidence from both sides that rebuts the presumption, as is the case herein, there remains no evidence that the Petitioner acted with specific intent to kill or cause serious bodily injury. *Id*.

In this case, the undisputed circumstances leading up to Peddy's shooting, as well as Petitioner's conduct and her words after Peddy was shot, all demonstrate Petitioner's state of mind and lack of intent to harm or kill Peddy. Specifically,

10

Peddy had been drinking and was causing a disturbance, including cursing and causing property damage, prior to the shooting, even having already required police to be called to the home that day. (4 R.R. 60-62). Peddy assaulted Petitioner, and even the investigating officer confirmed that the redness and abrasion to the right side of Petitioner's face looked like they had probably just occurred as a result of the reported assault. (4 R.R. 22-23, 34). Witnesses reported that Petitioner was distraught, shaking and crying and very upset, continually saying she was sorry and that she didn't mean for it to happen, after the shooting occurred. (4 R.R. 35-36, 66; 5 R.R. 114). Petitioner herself reported to police that she was not aiming for Peddy, but was only trying to fire warning shots because she feared for her safety. (4 R.R. 66). Notably, this testimony was unrebutted. Indeed, there was no affirmative evidence presented at trial of specific intent to kill or harm Peddy.

This constitutes no evidence, or nothing more than a "modicum" of evidence, probative of an essential element of the offense; accordingly, the evidence is insufficient to support Petitioner's conviction in this case. *Gonzalez,* 337 S.W.3d at 479. Therefore, Petitioner's conviction should be reversed and a judgment of acquittal rendered. Alternatively, Petitioner's conviction should be reversed and the verdict reformed to the lesser-included offense of manslaughter in conformity with the evidence presented at trial. *See Bowen v. State*, 374 S.W.3d 427, 432 (Tex. Crim.

11

App. 2012) (holding that a court of appeals may reform a trial court's judgment to a lesser-included offense).

## PRAYER FOR RELIEF

Petitioner prays this Court sustain the issues as set forth above, reverse the trial court's judgment and render a verdict of acquittal; alternatively, Petitioner prays that this Court reform the verdict to the lesser-included offense of manslaughter, and remand the case to the trial court for a new trial as to sentencing.

Oral argument is requested in the event that the court determines that it will aid in their determination.

Respectfully submitted,

CHRISTINE R. BROWN-ZETO
ATTORNEY AT LAW
1107 Green Ave.
Orange, TX 77630
Phone: (409) 886-8558
Fax: (409) 883-6523
crbrown@exp.net

By:     /s/ Christine R. Brown-Zeto
        Christine R. Brown-Zeto
        State Bar No. 03102200

ATTORNEY FOR PETITIONER
JULIA RHOTON ANDREWS

## CERTIFICATE OF COMPLIANCE

I certify that this document was generated by a computer using Word Perfect 12, which indicates that the word count of this document is 3074 excluding portions omitted from that count per Tex. R. App. P. 9.4 (i).

/s/ Christine R. Brown-Zeto
Christine R. Brown-Zeto


## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served on the following by hand delivery on February 6, 2015:

Tom Kelley
Assistant District Attorney
801 W. Division Street
Orange, Texas 77630
*Attorney for Respondent, State of Texas*

/s/ Christine R. Brown-Zeto
Christine R. Brown-Zeto

APPENDIX

## In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

### NO. 09-13-00407-CR
_____

### JULIA RHOTON ANDREWS, Appellant

### V.

### THE STATE OF TEXAS, Appellee

On Appeal from the 260th District Court
Orange County, Texas
Trial Cause No. D-130174-R

### MEMORANDUM OPINION

Contending that the evidence is legally and factually insufficient to support the jury's murder conviction, Julia Rhoton Andrews appeals from her conviction for murder. In her appeal, Andrews claims the evidence shows the decedent's death was accidental, or shows that her decision to shoot the decedent was justified because she acted in self-defense. *See* Tex. Penal Code Ann. § 19.02 (West 2011). We affirm the trial court's judgment.

1

## Background

In an amended indictment, a grand jury indicted Andrews for Robert Peddy's murder. The indictment alleges that Andrews intentionally and knowingly caused Peddy's death by shooting him with a firearm, or that she committed an act clearly dangerous to human life by shooting him, intending to cause him a serious bodily injury. *Id.* at § 19.02(b)(1), (2). At the conclusion of Andrews' trial, the charge the trial court submitted allowed the jury to consider whether Andrews, instead of murder, recklessly caused Peddy's death. *Compare id.*, *with* Tex. Penal Code Ann. § 19.04 (West 2011). The trial court also instructed the jury on Andrews' claim of self-defense. *See* Tex. Penal Code Ann. §§ 9.31, 9.32 (West 2011). On completing their deliberations, the jury found Andrews guilty of murder, gave her a forty-four year sentence, and a $4,400 fine.

Andrews raises one issue in her appeal. According to Andrews, the evidence admitted during her trial is legally and factually insufficient to support the jury's determination that she acted with the intent to cause Peddy's death or to cause him a serious bodily injury.

## Standard of Review

Legal and factual sufficiency challenges are reviewed under the standards articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Brooks v. State*, 323

2

S.W.3d 893, 912 (Tex. Crim. App. 2010). In reviewing a sufficiency challenge in a criminal case, the evidence is viewed, on appeal, in the light most favorable to the verdict. *Id*. at 899. Based on the evidence admitted during the trial, together with the reasonable inferences that are available from the evidence, the appellate court then determines whether a rational factfinder could have found the essential elements of the crime, under a beyond-reasonable-doubt standard of proof. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011).

With respect to Andrews' claim of self-defense, Andrews bore the burden to produce evidence supporting her defense; once Andrews introduced evidence showing that she acted in self-defense, the burden shifted to the State to disprove her defense, and the State was required to convince the jury, beyond reasonable doubt, that Andrews had not acted in self-defense. *See Zuliani v. State*, 97 S.W.3d 589, 594-95 (Tex. Crim. App. 2003). Given that the jury found Andrews guilty, there is an implicit finding that the jury rejected Andrews' claim that she acted in self-defense. *Id*. at 594. When reviewing whether legally sufficient evidence supports a finding against the defendant's claim of self-defense,

> we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have

found against appellant on the self-defense issue beyond a reasonable doubt.

*Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

A person commits murder when she intentionally[1] or knowingly[2] causes the death of another person, or if she intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. Tex. Penal Code Ann. § 19.02(b). Generally, a person is justified in defending against another's use of deadly force. *See Morales v. State*, 357 S.W.3d 1, 7 (Tex. Crim. App. 2011). Under the Penal Code, a person is justified in using deadly force (1) if she would be justified in using force against the other under section 9.31 of the Texas Penal Code, and (2) when and to the degree she reasonably believes the deadly force is immediately necessary to protect herself against the other's use or attempted use of unlawful deadly force. Tex. Penal Code Ann. § 9.32(a)(1), (a)(2)(A). Section 9.31 of the Penal Code justifies a person to use force "when and to the degree the actor reasonably believes the force is

---

[1] A person acts intentionally with respect to a result of her conduct when it is her conscious objective or desire to cause the result. Tex. Penal Code Ann. § 6.03(a) (West 2011).

[2] A person acts knowingly with respect to a result of her conduct when she is aware that her conduct is reasonably certain to cause the result. *Id.* § 6.03(b) (West 2011).

immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a).

Several additional standards guide our review of Andrews' case. In cases where the evidence is in conflict, the jury acts as the sole judge of the credibility of the witnesses, and it judges the weight to give to the testimony of the witnesses. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). By statute, a firearm is a deadly weapon. Tex. Penal Code Ann. § 1.07(17)(A) (West Supp. 2014). "The jury may infer the intent to kill from the use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from the use of the weapon." *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). In determining a defendant's guilt, a jury may consider events that occurred before, during, and after the commission of the offense. *Pitonyak v. State*, 253 S.W.3d 834, 844 (Tex. App.—Austin 2008, pet. ref'd).

## Analysis

According to the testimony before the jury, Andrews admitted that she shot Peddy from her porch, but claimed that she shot Peddy accidentally. In the statement that Andrews gave to the police shortly after the shooting, Andrews indicated that she first fired a warning, and then fired again, maybe two or three times, in Peddy's direction to scare him away. According to Andrews, Peddy

5

assaulted her shortly before she shot him, and she was scared of him. Pictures of Andrews, admitted during the trial, show scratches on Andrews' arm and redness on her face and neck. There was also testimony indicating that the police noticed the redness on Andrews' face during their investigation into Peddy's death. While Andrews claimed that she was afraid of Peddy, she also indicated that he had never assaulted her before the day that she shot him.

The evidence from the trial shows that Andrews and Peddy had a relationship with each other that had ended some time before the day the incident occurred. After their relationship ended, Peddy began dating Andrews' daughter. Due to his relationship with Andrews' daughter, Peddy frequently stayed at Andrews' house, as Andrews' daughter lived there.

The day the incident occurred, Peddy came to Andrews' home and left several times. In the statements Andrews gave the police, Andrews stated that Peddy was an alcoholic; that vodka made Peddy a "mean, hateful, ugly, and [a] totally different person[;]" and that in the past, Peddy had hit her daughter. Andrews also told the police during the investigation that Peddy was drinking vodka the day she shot him. An autopsy report showed that Peddy's blood alcohol concentration level was 0.261.

Andrews told the police that Peddy was intoxicated when he came to her house the evening that she shot him. She also indicated that her daughter, who was not at home the evening when Peddy came there, was aware he was at Andrews' home. Andrews' daughter called the police, and she requested that they go to Andrews' home to check on Andrews. When the police arrived, Andrews told the officer who arrived that Peddy was inside, and she told the officer that she thought he was about to fall asleep. Andrews assured the police that everything would be okay, and she indicated they did not need to do anything.

Peddy became agitated on learning that the police had been called to the home. After the officer left, Andrews indicated that she told Peddy to leave. Peddy went outside, but he did not leave. After hearing a noise, Andrews stepped onto her porch and saw Peddy throwing cement blocks into the windows and windshield of her car. Andrews went to her car, which was parked to the side of her house, outside a fenced yard. After approaching Peddy, Andrews and Peddy began to argue, and Peddy hit and shoved her.

K.H., who lived with Andrews, saw the altercation between Andrews and Peddy that occurred that evening near Andrews' car. K.H. stated during her testimony that she called 911. According to K.H., Peddy "was scary that night[,]" and she saw Peddy hit Andrews.

7

The statement Andrews gave to the police indicates that following the altercation near her car, Andrews returned to her house and locked the door. According to Andrews, Peddy came to the side of the porch, which was outside the fenced portion of her yard, and began to throw things at her as she left the porch to enter her home. Once inside, Andrews indicated that she went to her bedroom, got her rifle, and returned to the porch. Andrews told the police that she fired one warning shot away from Peddy. Andrews stated that Peddy began walking towards her after she fired the first shot, holding out his shirt, and telling her to shoot him. Andrews related that she then turned the rifle towards Peddy and fired additional shots, from her hip, one of which struck Peddy in the heart. The police estimated that the bullet struck Peddy approximately forty feet from where Andrews fired her rifle. Andrews did not testify at her trial.

Although jurors might have inferred from Andrews' statements that she never intended the bullets from her rifle to hit Peddy, it was also reasonable, on this record, for the jury to infer that Andrews was aware that her conduct—pointing the rifle towards Peddy and firing shots at him—was reasonably certain to cause Peddy's death. As the factfinder, the jury was free to disregard Andrews' claim that she did not mean to shoot Peddy when she fired at him. *See Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000) (holding evidence was sufficient

8

to prove intent to kill despite appellant calling 911 and describing his actions as accidental during his confession); *Jones*, 944 S.W.2d at 648 (holding evidence was sufficient to prove intent to kill, despite appellant's statement that he "only wished to scare the victim"). We conclude that the evidence is legally and factually sufficient to support the jury's conclusion that Andrews intended to cause Peddy's death. *Jones*, 944 S.W.2d at 647.

With respect to Andrews' claim that she acted in self-defense, the jury could consider the circumstances before and after Peddy was shot. Based on the evidence before the jury, the jury could have inferred from the circumstances that Andrews' decision to shoot Peddy was not reasonably necessary, given the opportunity she had to stay inside the locked house, the circumstances of the altercation, and the distance from which Andrews fired after she returned to the porch. *See* Tex. Penal Code Ann. § 9.32(a)(1), (a)(2)(A); *Madrigal v. State*, 347 S.W.3d 809, 818 (Tex. App.—Corpus Christi 2011, pet. ref'd) (noting that while there was evidence tending to show the defendant had acted in self-defense, the factfinder was free to disbelieve that evidence and rely on other evidence tending to show that the defendant had not acted in self-defense).

After considering the evidence in the light most favorable to the jury's verdict, we conclude the evidence supports the jury's decision to convict Andrews

9

of murder and to reject her claim of self-defense. *See Gear*, 340 S.W.3d at 746; *Saxton*, 804 S.W.2d at 914. We overrule Andrews' sole issue, and we affirm the trial court's judgment.

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on July 29, 2014
Opinion Delivered December 10, 2014
Do Not Publish

Before Kreger, Horton, and Johnson, JJ.

10